IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Tony Curtis Gilmore,                          )
                                              )        Civil Action No. 6:16-59-JMC-KFM
                        Plaintiff,            )
                                              )        **REPORT OF MAGISTRATE JUDGE**
          vs.                                 )
                                              )
Carolyn W. Colvin, Acting                     )
Commissioner of Social Security,              )
                                              )
                        Defendant.            )
_____)

This case is before the court for a report and recommendation pursuant to
Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases
in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) of the Social
Security Act, as amended (42 U.S.C. 405(g)), to obtain judicial review of a final decision of
the Commissioner of Social Security denying his claim for disability insurance benefits
under Title II of the Social Security Act.

The plaintiff filed his first application for disability insurance benefits on August
11, 2006, alleging disability beginning September 13, 2005. The application was denied
initially and on reconsideration by the Social Security Administration. The plaintiff requested
a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and an impartial
vocational expert appeared on December 5, 2008, considered the case *de novo* and on
May 5, 2009, found that the plaintiff was not under a disability as defined in the Social
Security Act, as amended. On March 3, 2011, the Appeals Council remanded the case to
the ALJ. On August 8, 2011, the plaintiff and another impartial vocational expert attended
a second hearing held before the same ALJ. On October 26, 2011, the ALJ issued a
partially favorable decision, finding the plaintiff disabled beginning on August 1, 2009 (Tr.

_____

[1] A report and recommendation is being filed in this case, in which one or both parties
declined to consent to disposition by the magistrate judge.

134-41). On April 10, 2012, the Appeals Council again remanded the case and directed it be assigned to a different ALJ.

On October 2, 2012, the plaintiff appeared at a third hearing before a different ALJ. An impartial vocational expert also appeared at the hearing. The plaintiff appeared without the assistance of an attorney. On December 14, 2012, the ALJ issued a partially favorable decision finding the plaintiff disabled beginning on December 3, 2008 (Tr. 9-17). The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on March 29, 2013 (Tr. 1).

The plaintiff appealed the decision in this court on May 29, 2013. On April 9, 2014, the Commissioner filed a motion to remand pursuant to sentence four of 42 U.S.C. § 405(g). On June 11, 2014, the district court affirmed the Commissioner's decision that the plaintiff was disabled since December 3, 2008, and remanded the decision on the issue of disability prior to December 3, 2008 (*see* C.A. No. 6:13-cv-01443-JMC, doc. 49). Upon remand, on August 1, 2014, the Appeals Council directed the ALJ to:

> Obtain evidence from a medical expert to clarify the date of onset, give further consideration to the claimant's maximum residual capacity and provide the rationales, as well as obtain evidence from a vocational expert.

(Tr. 732; *see* Tr. 892-94).

On November 20, 2014, the plaintiff and Allen N. Levine, M.D., an orthopaedic surgeon and impartial medical expert, and Robert E. Brabham, Jr., an impartial vocational expert, appeared at a fourth hearing before the ALJ. On February 19, 2015, the ALJ issued a decision finding that the plaintiff was not under a disability as defined in the Social Security Act, as amended, from September 13, 2005, through December 2, 2008, the relevant period in question (Tr. 732-41). The ALJ's decision became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on November 5, 2015 (Tr. 715-16). The plaintiff then filed this action for judicial review.

2

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2010.

2. The claimant did not engage in substantial gainful activity from his alleged onset date of September 13, 2005, through December 2, 2008, the relevant period in question (20 C.F.R. § 404.1571 *et seq.*).

3. From September 13, 2005, through December 2, 2008, the relevant period in question, the claimant had the following severe impairments: spinal stenosis, epidural fibrosis, degenerative disc disease of the lumbar spine, failed back syndrome/ post lumbar laminectomy syndrome, lumbar spondylosis, left lumbar facet syndrome and myofascial pain syndrome (20 C.F.R. § 404.1520(c)).

4. From September 13, 2005, through December 2, 2008, the relevant period in question, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, I find that, from September 13, 2005, through December 2, 2008, the relevant period in question, the claimant had the residual functional capacity to perform "light" work as defined in 20 C.F.R. 404.1567(b) except that he was limited to sitting for up to six hours and standing for up to three hours. Further, he was limited to walking for up to two hours, and he must be allowed to alternate between sitting and standing up to twice each hour. He needed the use of an assistive device to ambulate. He was limited to occasional postural, but was to avoid ladders, ropes, scaffolds, unprotected heights, and machines with dangerous parts. Additionally, he was to avoid walking on uneven surfaces and repetitive twisting and bending from the trunk. He was capable of following short, simple (not detailed) instructions and performing routine tasks, but he was to perform no working requiring a production rate or demand pace. He was able to sustain attention and concentration for two hours at a time. Finally, he required one to two additional five-minute rest breaks.

6. From September 13, 2005, through December 2, 2008, the relevant period in question, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on July 9, 1962, and was 48 years old, which is defined as a younger individual age 18-49, on the date last insured (20 C.F.R. § 404.1563).

3

8.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404. Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569, and 404.1569(a)).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from September 13, 2005, through December 2, 2008, the relevant period in question (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4)  has an impairment that

4

prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct

a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was born on July 9, 1962 (Tr. 114). He completed his education through the tenth grade (Tr. 31). His past work history included work as a shift manager in electrical manufacturing, as a line operator in manufacturing, and as a fixer in textiles (Tr. 329). He alleged that he became disabled to work on September 13, 2005, due to injuries to his back and leg (Tr. 328).

The plaintiff was seen at Piedmont Urgent Care on July 12, 2004, with complaints of back pain after being hit by the hook of a crane at work. X-rays of the lumbosacral spine showed no fracture, but lumbar spondylosis (Tr. 511-12). He was told to not lift anything greater than ten pounds and to do no work that required repetitive or prolonged bending/stooping, no lifting between floor to waist or waist to shoulders, and no twisting and turning of his back. He would experience drowsiness due to medications (Tr. 511-53). On July 15, 2004, the plaintiff reported occasional numbness into his legs and constant back pain (Tr. 515-16). On July 24, 2004, the plaintiff was prescribed physical therapy and given the same work restrictions as before (Tr. 518-19). A July 28, 2004, lumbar MRI showed a small central disc protrusion at L5-S1 approaching the S1 nerve root at the lateral recesses without nerve impingement or stenosis (Tr. 562). The plaintiff was

6

referred to Carolina Orthopedics (Tr. 525). On July 29, 2004, the plaintiff returned with pain in his right leg and back (Tr. 521, 524).

The plaintiff was treated by James N. Rentz, Jr., at Carolina Orthopedics, from August 6, 2004, to August 27, 2004, for lumbar strain with spasms (Tr. 557-58). Examinations showed no point tenderness of the lower back, no straight leg pain with either extremity, and intact neurological exam for both lower extremities, although he worked slowly. He was told to restrict work to light duty until September 6, 2004 (Tr. 556-57). Dr. Rentz noted that there was no permanent impairment from the injury (Tr. 557). On September 4, 2004, the plaintiff had worsening back pain. He reported that physical therapy was aggravating his pain. He was referred to orthopedics (Tr. 526-27).

On October 13, 2004, the plaintiff treated with Sami J. Oweida, M.D., for complaints of back pain. The plaintiff noted that he had not missed any work and had been working light duty, but 12-hour shifts and sitting aggravated him. On examination, his gait was antalgic, lumbar spine was straight, and straight leg raising tests were negative. He reported occasional radiation of pain to his right leg. He had no palpable lumbar spasm, negative figure of 4 testing for lumbosacral pain, and no focal weakness or atrophy of the lower extremity. Heel and toe walking were intact. A lumbar MRI showed a small disc herniation, which appeared to be abutting but not displacing the thecal sac at the S1 nerve root. Dr. Oweida stated that the plaintiff was experiencing a tremendous amount of back pain. The plaintiff was prescribed Lortab and scheduled for a lumbar epidural steroid injection. He was continued on light duty with no required sitting of longer than 20 minutes at a time. He could lift and carry less than or equal to ten pounds. He should do no bending, squatting, climbing, kneeling, or crawling with only occasional overhead work. Dr. Oweida provided a work status report allowing the plaintiff to work limited duty as of October 13, 2004 (Tr. 533-38).

7

On December 27, 2004, the plaintiff still had back pain with radiation to the right leg. He was having a difficult time tolerating limited duty. He had positive straight leg raises on the right side. He was kept on limited duty and was scheduled for three epidural steroid injections. The plaintiff returned on January 28, 2005. He had no relief from the injections. Dr. Oweida wrote a work excuse until January 31, 2005, and recommended that the plaintiff see a spine specialist for surgical treatment (Tr. 541).

The plaintiff was referred to Craig Brigham, M.D., at OrthoCarolina, on March 7, 2005 (Tr. 545). Dr. Brigham suggested more exercise and explained that most disc herniations resolve non-operatively. However, he kept the plaintiff on light duty and requested a repeat MRI (Tr. 545). On April 18, 2005, Dr. Brigham noted that there was no evidence of acute injury or neurocompression in the MRI and suggested that the plaintiff look for other work if he felt he cannot lift. Dr. Brigham stated that the amount of desiccation in his MRI is normal for his age, and he did not have a medically objective reason to continue him on restrictions (Tr. 546). He was scheduled for a right S1 nerve root block, which he received on May 12, 2005 (Tr. 546-47).

On June 8, 2005, the plaintiff returned with complaints of back pain, but examination revealed no neurological deficits in the lower extremities (Tr. 423). Dr. Brigham noted that the plaintiff's studies showed significant disc degeneration at L5-S1 and recommended a minimally invasive fusion because of his age (Tr. 423). Dr. Brigham noted that he could get back to work in a few weeks in a light-capacity and back to full duty within three to five months (Tr. 422-23).

On August 5, 2005, the plaintiff returned with significant discomfort, and Dr. Brigham limited the plaintiff to six-hour shifts (Tr. 422-23). Dr. Brigham felt that a minimally invasive transforaminal lumbar interbody fusion ("TLIF") operation was the least invasive way to address the plaintiff's degenerative disc (Tr. 421; *see* Tr. 548).

8

On September 13, 2005, the plaintiff underwent a minimally invasive L5-S1 fusion, instrumentation, bone graft, and TLIF with Dr. Brigham to treat a degenerative disc at L5-S1 (Tr. 453, 455).    In the recovery room and throughout his subsequent hospitalization, his bilateral lower extremities were neurologically intact (Tr. 455).  He was extremely slow to mobilize in physical therapy, which extended his hospital stay.   At discharge, his pain was well-controlled on oral medication (Tr. 455).

The plaintiff was treated at NovaCare Rehabilitation from September 27, 2005, to December 12, 2005 (Tr. 390-415).  At the plaintiff's initial evaluation, it was noted that he was in fair physical condition overall, and he was encouraged to walk a good deal and get in better shape to return to normal activities (Tr. 415).  The plaintiff's therapist noted that although his range of motion and strength were unchanged after three visits, the plaintiff tolerated more exercise and less rest (Tr. 411).  His walk was less guarded despite unchanged pain complaints (Tr. 408).  At an October 2005 evaluation, the plaintiff reported minimal improvement overall (Tr. 403), but the therapist noted that the plaintiff self-limited his progress secondary to complaints of pain (Tr. 404).

On September 30, 2005, the plaintiff complained of back pain and bilateral numbness to Dr. Brigham.  He was using a walker.  Physical examination did not suggest any true motor or reflex abnormality in the lower extremities.  X-rays showed adequate position of hardware and interbody graft.  Dr. Brigham informed the plaintiff that he needed to taper off his narcotics and get into physical therapy and that the numbness was transient and would get better (Tr. 420).

The plaintiff followed up with Dr. Brigham on October 17, 2005.  The plaintiff stated that he was slowly improving, but continued to complain of significant pain.  On examination, the plaintiff's wound had no surrounding erythema or wound drainage.  Range of motion was still very poor, but with no active tension signs.  Examination of the lower extremities showed 5/5 (full) strength, and x-rays revealed appropriate placement of the

9

pedicle screws and no hardware breakage.  Dr. Brigham recommended physical therapy and a TENS unit (Tr. 419).   On November 2, 2005, the plaintiff reported pain and intermittent falling. He was using a cane. He had very limited range of motion of his lumbar spine.  It was noted that he should not return to work until he was re-evaluated (Tr. 418, 452).

The plaintiff attended physical therapy 12 times in November 2005.   On December 1, 2005, the therapist wrote that the plaintiff participated well but progressed very slowly due to persistent pain.  The plaintiff reported minimal improvement overall.  He had continued pain in his feet, and his sleep was significantly limited.  He had a positive straight leg raise on the right at 50 degrees and on the left at 60 degrees (Tr. 392-404).

On November 11, 2005, the plaintiff saw Dr. Brigham for complaints of pain. Physical examination showed no motor or reflex abnormality in the lower extremities, though his hamstrings were very tight.  The incisions were well-healed, though he had a very limited range of motion in his lumbar spine.  The x-rays showed good position of the hardware and interbody fusion graft.  Dr. Brigham encouraged the plaintiff to taper the narcotic medication (Tr. 418).  The plaintiff called the office twice requesting additional narcotics, but was reminded that he needed to taper the medication (Tr. 447-49).

In November 2005, the plaintiff arrived late for physical therapy appointments twice, was a no-show once, and complained that his new medication did not help (Tr. 396, 398, 402).  His therapist noted that the plaintiff complained of pain despite the gentle nature of the program and lacked progress due to self-limitations (Tr. 401).  On November 15, 2005, the plaintiff felt that he was in too much pain to stop taking the pain medications (Tr. 449).  On November 22, 2005, the plaintiff called and stated that he had burning in both of his legs that kept him awake at night.  The Neurontin was not helping (Tr. 447-48).

On December 6, 2005, the plaintiff expressed concerns regarding his continued bilateral leg burning/aching. He had called Dr. Brigham's office on December 2nd asking for more pain medication (Tr. 445).

At a December 7, 2005, physical therapy assessment, the plaintiff reported minimal improvement and persistent pain, but tolerated walking on the treadmill up for ten minutes over the last two weeks (Tr. 392). Although the plaintiff reported no change in tolerance for functional activities, he moved and walked with greater ease and less guarded posture (Tr. 391). The plaintiff was told to continue to increase his activities, but he needed encouragement. On December 14, 2005, the plaintiff's physical therapy was put "on hold per pt [patient]" (Tr. 390). Physical therapy was discontinued until after re-evaluation and CT scan from Dr. Brigham (Tr. 390-91,442).

The plaintiff contacted Dr. Brigham's office again on December 28, 2005, requesting more pain medication (Tr. 439). The office continued to decline the plaintiff's request, and the plaintiff was advised to use alternative methods of pain relief (Tr. 439, 441).

At a January 9, 2006, followup, the plaintiff complained "bitterly" of back and leg pain. The plaintiff was still using a cane and required a large amount of narcotics (Tr. 417). Upon examination, Dr. Brigham found no specific motor or reflex abnormality in the lower extremity, and the lumbar CT scan showed good position of the hardware and subsidence of the graft, although there appeared to be some early obliteration of the interface lines at L5 continuing to S1. There was soft tissue attenuation filling the left lateral recess and left neuroforamen at L5-S1, which might represent scar formation from surgery. The scar formation likely caused some irritation or impingement of the exiting left L5 nerve root (Tr. 417, 451, 542-43). The fusion on the right side at L5-S1 was "looking very good." Dr. Brigham felt that the plaintiff was taking "an extraordinary amount of narcotics for a small surgery." Dr. Brigham noted that the plaintiff would ultimately be released without any

11

permanent restrictions and would not be considered permanently and totally disabled (Tr. 417).

The plaintiff called Dr. Brigham's office several times in January and February 2006 with complaints of pain and requests for narcotics (Tr. 426-32, 435-36). The office told the plaintiff no more narcotics would be written as the plaintiff was six months post-op (Tr. 426). Despite his requests for pain medication, the plaintiff reported that he walked each day with his dogs, but stopped formal physical therapy (Tr. 428). On January 26, 2006, the plaintiff still had back pain and burning in his left leg and foot. He stated that Lyrica did not work. He was prescribed Cymbalta and given a refill of Hydrocodone (Tr. 435). On February 14, 2006, the plaintiff had continued back pain, bilateral thigh pain, and foot burning. The plaintiff asked why he was in such pain and why he was not improving (Tr. 428). On February 28, 2006, the plaintiff called and reported continued pain (Tr. 426).

On March 8, 2006, the plaintiff returned to Dr. Brigham. His examination was without change, and he had no motor or reflex abnormality in the lower extremities. X-rays showed that his fusion progressed, there was no shift of hardware, and there appeared to be a fusion mass. The plaintiff "fe[lt] bitterly that he is incapable of doing any work whatsoever," but Dr. Brigham "d[id] not have objective reasons for this." The plaintiff still had bilateral leg burning. Dr. Brigham felt that the plaintiff had reached maximum medical improvement and gave him a 30% impairment rating for a one-level fusion for a degenerative disc. Dr. Brigham opined that the plaintiff did not have a very severe problem to begin with, even though his complaints of severe pain led to the recommendation of a fusion. Dr. Brigham noted that there was no objective reason why physiologically he should not respond as any other young man who has no neurological deficits. Dr. Brigham expected his symptoms to improve over time. He further opined that he would allow the plaintiff to do whatever he was comfortable doing, even heavy lifting (Tr. 416). Dr. Brigham also completed a work status report form permitting him to return to regular duties (Tr. 450).

12

On May 15, 2006, the plaintiff saw Thomas G. Fleischer, M.D., of Carolina Orthopaedic Surgery Associates, for a second opinion following his back surgery. The plaintiff stated that he could not work and was still in need of pain medicine. On examination, plaintiff looked healthy and was in moderate distress. He had a cane, but could walk with a normal gait. He had good strength by manual motor testing and negative straight leg raises. He had pain on any lumbar range of motion, although his range of motion was fairly good and his incision was well-healed. Radiographic studies showed well-positioned pedicle screws at L5-S1 with no motion at that level. Dr. Fleischer stated that he reached maximum medical improvement and that he had a whole person impairment of only 10% or 17% in the lumbar spine only. He opined that the plaintiff was young and should be able to return to work. Dr. Fleischer stated that the plaintiff needed to work on an endurance program and discontinue the use of narcotics (Tr. 459).

The plaintiff treated at Premier Clinic beginning on May 19, 2006, with Bamidele Ekunsanmi, M.D., a primary care physician, for complaints of lower back pain (Tr. 461-68, 574, 580-83, 585-86). In June 2006, Dr. Ekunsanmi ordered an MRI of the lumbar spine with and without contrast, which revealed post-surgical change at L5-S1, enhancing scar surrounding portions of the left S1 nerve root, and no evidence of recurrent disc herniation (Tr. 460). The plaintiff returned on July 5, August 2, August 18, September 15, and October 13, 2006, and January 19, 2007, with back pain (Tr. 461-463, 482-483, 611).

The plaintiff also began treatment with Henry Okonneh, M.D., on May 19, 2006, for complaints of low back pain (Tr. 467). On examination on July 23, 2006, the plaintiff did not appear acutely ill-looking and was not in any form of distress. His neck was supple and nontender, and the cervical spinous process was midline. The plaintiff's cranial nerves were grossly intact. The plaintiff walked with a mild limp, though he did not walk with the aid of a cane. A neurological exam revealed that his temperature, light touch, and proprioception were normal, though his deep tendon reflexes were diminished. He had no

13

ankle clonus and no Babinski sign.  Motor strength was 5/5 (full) in all extremities.  A musculoskeletal exam showed normal thoracic kyphosis and lumbar lordodis, but right, lumbar paravertebral tenderness and positive straight leg raising and axial loading tests (Tr. 477).  The plaintiff could heel and toe walk, and his hip, knee, and ankle examinations were within normal limits.  He had no muscle atrophy or fasciculation.  Dr. Okonneh's initial impression was failed back surgery syndrome and right lumbar facet syndrome, and he suggested injections (*id*.).  The pain radiated down the plaintiff's right lower extremity.  He reported numbness and weakness in his right lower extremity to the extent that his right leg occasionally buckled.  He did not sleep well due to pain.  Prolonged standing worsened his pain.  He used a TENS unit, which moderately helped the pain level.  An MRI of the lumbar spine showed scar tissue surrounding a portion of the left, S1 nerve root (Tr. 479).  On July 27, 2006, the plaintiff received right lumbar nerve root blocks and right lumbar facet joint injections (Tr. 476).

      The plaintiff met with Benson Hecker, Ph.D., a rehabilitation specialist, at the request of his attorney, on July 28, 2006 (Tr. 565).  Although he was not a medical doctor, Dr. Hecker reviewed the medical records and conducted an interview (Tr. 565-71), opining that the plaintiff was limited in sitting, standing, walking, carrying, lifting, stooping/squatting, climbing, turning/twisting his spine, forward bending, and reaching with weights (Tr. 572).  The plaintiff still experienced moderate to severe pain that required him to stop activities, change position, take medication, lie down, and use a TENS unit and pain patch.  Vocationally, any light or sedentary levels of physical exertion would involve sitting, standing, walking, concentrating, and maintaining task investment for long periods of time.  He would be required to maintain work attendance on a regular basis and be able to effectively deal with normal work stress.  The plaintiff's impairments were considered and it was Dr. Hecker's opinion that he was unable to effectively perform the identified "basic"

work-related behavior and that he would be unable to perform any substantial gainful work activity (Tr. 573).

On August 10, 2006, the plaintiff received injections (Tr. 475). On August 24, 2006, he received the third set of injections (Tr. 474).

On September 1, 2006, the plaintiff saw Dr. Okonneh following a series of three injections. He continued to have low back pain with lumbar radiculopathy. On examination, his vital signs were stable, although he had bilateral, lumbar paravertebral tenderness (Tr. 473, 497). After the injections, he still had moderate to severe pain in his lower back. He also had a burning sensation in his lower extremities, especially on the right. Dr. Okonneh started Lidoderm patches and Lyrica, in addition to Lortab and a Duragesic patch (Tr. 473). A request for additional injections was declined due to his recent completion of injections the month before (Tr. 497).

On December 22, 2006, Dr. Okonneh noted that the plaintiff's problems remained the same. The plaintiff had increased pain in his lower back, and his left lumbar radicular pain was worsening (Tr. 496). On January 19, 2007, the plaintiff had moderate to severe pain. He was scheduled for more injections, which he received on February 15, March 1, and March 15, 2007 (Tr. 592-595). On April 13, 2007, the plaintiff had moderate pain, as well as occasionaly cramping in his left shoulder and left arm. He was prescribed Skelaxin and Elavil (Tr. 596). On May 11, 2007, the plaintiff had increased pain in his lower back, which radiated to his right lower extremity (Tr. 597).

The plaintiff followed up in April and May 2007, at which time Dr. Okonneh increased his Duragesic patch and scheduled a lumbar root nerve block (Tr. 596-97). He received another series of three injections on June 7, June 20, and July 5, 2007 (Tr. 598-600). Followups in August 2007 noted that the plaintiff requested additional injections, which were declined by Dr. Okonneh. He advised that his pain would be managed with medication for the time being. Dr. Okonneh noted that the plaintiff walked with a cane, had

15

mild difficulty in ambulation, and had bilateral sacroiliac joint tenderness (Tr. 601-602). The plaintiff continued on his medication through the end of the year (Tr. 604).

On October 23, 2007, the plaintiff underwent an independent medical evaluation with Glenn L. Scott, M.D., an orthopedic surgeon (Tr. 587-90). The plaintiff had back pain that radiated down his left leg. He stated that he typically had pain in both legs, but his left leg was worse at this time. MRI scans demonstrated a disc protrusion at L5-S1. Dr. Scott found that the plaintiff had status post-operative lumbar interbody effusion L5-S1 with persistent pain syndrome. He found the plaintiff to be at maximum medical improvement with a whole person impairment of 28%. Dr. Scott wrote that the plaintiff definitely had restriction that could best assessed through a formal functional capacity evaluation (Tr. 587-90). On examination, the plaintiff was muscular and well-developed. Although the plaintiff walked with a cane, he ambulated well without it. The plaintiff was able to touch his foot on the left side without apparent difficulty. He rose from the chair and moved on and off the exam table independently (Tr. 588). He had good mobility in the cervical and thoracic spines and negative straight leg raising tests, and Dr. Scott could not detect any sustained paravertebral lumbar spasms. The plaintiff maintained heel and toe standing and had good strength on plantarflexion and dorsiflexion, though he endorsed some decreased sensory acuity in his feet (Tr. 589). Dr. Scott recommended that the plaintiff discontinue injections, reduce his pain medication, and undergo reasonable job training (Tr. 589). Dr. Scott opined that the plaintiff was at maximum medical improvement (Tr. 590).

On October 31, 2007, Dr. Ekunsanmi wrote a letter, noting that complications of the plaintiff's spinal injury include paraparesis of lower extremities, urinary incontinence, and erectile dysfunction and that "[t]hese disabilities are permanent" (Tr. 591).

The plaintiff underwent additional injections with Dr. Okonneh in March and April 2008 (Tr. 621-23). A followup in May 2008 noted that the plaintiff had mild to

moderate pain, but no longer reported lumbar radicular pain, and he did not have tingling, numbness, or weakness in the right lower extremity.  He had a positive straight leg raising test and Patrick's test; however, his axial loading test was negative, and motor strength was 5/5 in all extremities.  He had mild difficulty in ambulation and walked with the aid of a cane (Tr. 624).  On June 6, 2008, the plaintiff reported that he functions daily with continued use of medication and denied any side effects.  His examination was unchanged (Tr. 625).

On March 5, April 25, May 28, June 27, July 25, August 29, and November 26, 2008, the plaintiff was treated at Premier Clinics for lower back pain, persistent lower extremity weakness, neuropathy, erectile disorder, and paraparesis.  He had positive straight leg raising tests, positive Patrick's test, and he walked with the aid of a cane (Tr. 612-18).  On March 13, March 27, and April 10, 2008, the plaintiff received another series of three injections (Tr. 621-23).

On May 9, 2008, the plaintiff continued to have mild to moderate pain in his lower back and mild difficulty in ambulation (Tr. 624).  On June 6, 2008, the plaintiff had occasional radiation of pain to his right lower extremity with tingling and numbing.  The injections moderately reduced his pain (Tr. 625).  On August 1, 2008, the plaintiff had moderate to severe pain in his lower back, which radiated to his lower extremities.  He had mild difficulties in ambulation, walked with a cane, and had positive straight leg raising tests.  His exam was significant for bilateral sacroiliac joint tenderness (Tr. 626).  On August 29, 2008, the plaintiff's status had not changed (Tr. 627).  On September 26, 2008, the plaintiff had mild to moderate pain with positive straight leg raising tests (Tr. 628).  On November 21, 2008, the plaintiff had moderate to severe pain in his lower back (Tr. 629).

On December 3, 2008, Dr. Ekunsanmi completed a physical capacities evaluation, in conjunction with an examination (Tr. 606-07, 620).  Dr. Ekunsanmi opined that the plaintiff could sit less than one hour, stand/walk less than one hour, and that he would need to alternate sitting and standing at will throughout the day.  He could not use

17

his hands for repetitive motion tasks. He should never lift more than eleven pounds, climb, balance, stoop, knee, crouch, crawl, or reach above shoulder level. Dr. Ekunsamni opined that there was a medical basis for the plaintiff's pain and that the pain would be disabling to the extent that it would prevent him form working full time at even a sedentary position (Tr. 606-609).

On December 14, 2011, Dr. Ekunsanmi provided a letter stating that the plaintiff has impaired mobility, paresthesias, and back pain with radiculopathy and that he "is disabled" (Tr. 644). Dr. Ekunsanmi submitted an additional letter on August 6, 2012, noting that the plaintiff was treated by him since January 1, 2005, and that he has been "declared disable[d]" since that time (Tr. 651).

### Administrative Hearing Testimony

A medical expert, Allan Levine, M.D., an orthopedic surgeon, testified at the fourth hearing in November 2014 via telephone (Tr. 872-78). He noted that the plaintiff was status postoperative fusion at the L5-S1 level completed on September 13, 2005 (Tr. 873). Although the plaintiff complained of his symptoms primarily being on the right, Dr. Levine noted that the MRI showed the scar tissue on the left; therefore, the scarring did not appear to be creating significant subjective pain and/or objective findings (Tr. 874). Dr. Levine opined that the plaintiff did not meet Listing 1.04 (Tr. 874-75). He also noted that, while the records mentioned that the plaintiff used a cane, they also stated that he was able to ambulate well without it. Dr. Levine stated that spinal fusion takes approximately 12 months to become radiographically, clinically, and functionally healed, or totally solvent. He opined that an individual would not be capable of even sedentary work on a sustained basis during that time from September 13, 2005, until September 13, 2006 (Tr. 876).

However, beginning on September 13, 2006, Dr. Levine stated that the plaintiff would be capable of lifting ten pounds frequently and 20 pounds occasionally; sitting for six out of eight hours; standing three out of eight hours, but no longer than 30 minutes

18

at one time with the ability to sit for one to two minutes; walking for two of eight hours, but no longer than 20 minutes at one time; should avoid uneven surfaces; could occasionally navigate ramps and stairs with a railing; occasionally kneel; could occasionally crouch, stoop, or bend, but not repetitively; should avoid ladders, scaffolds, crawling, heavy vibrating machinery, unprotected heights, and extreme cold exposure; should avoid repetitive twisting of the lumbar spine or trunk; and only use the upper extremities for fine and gross manipulation (Tr. 878).

The plaintiff testified that after his surgery he had burning pain and weakness in his legs. His legs would give out on him and he used a cane. The plaintiff estimated that he could probably stand or walk for 30 minutes before he would need to sit down. He would need to sit down or lie down and elevate his legs. Most days the plaintiff had to recline or lie down to relieve his pain. After his surgery, the plaintiff was in bed for eight hours during the day. After a recovery period, the plaintiff had to nap every day to relieve some of the pressure. The medications he was taking made him drowsy and a little sick to his stomach. The plaintiff stated that he could not return to the light duty that he performed before his surgery because he could not do any bending or squatting. After the surgery, the plaintiff experienced a burning sensation down his legs that he had not experienced before the surgery. He did not know the doctors were going to use rods and screws in order to perform the fusion. Neurontin was prescribed, but it made the plaintiff sleepy and like a zombie. The plaintiff testified that Dr. Ekunsanmi's assessment in 2008 was how he felt in 2005 as well (Tr. 860-67).

During the relevant time period the plaintiff lived in a home that did not have any stairs. He did not help with the cooking, because he did not know how to cook. He tried to help do the dishes, but he could not stand for a long period of time. He was able to drive, but it was difficult. He did not go for a walk for exercise. The plaintiff said that prior to his surgery he could sit for two hours, but, after his surgery, he could not. He had pain

19

and numbness down his right leg.  The pain was mostly in his toes, but it was also in the lower part of his thighs (Tr. 867-72).

The ALJ provided the vocational expert with a hypothetical question, where an individual of the plaintiff's age, education, and past work experience was limited to light work, where the individual could sit up to six hours and stand up to three hours, but limited to walking up to two hours; alternate between sitting and standing at least two times per hour; occasionally perform all postural activities, but should avoid ladders, ropes, scaffolds, unprotected heights, and machinery with dangerous parts; needed the use of an assistive device to ambulate; avoid walking on uneven surfaces and repetitive twisting and bending from the trunk; follow short, simple (not detailed) instructions and perform routine tasks; perform no work requiring a production rate or demand pace; sustain attention and concentration for two hours at a time; and required one to two additional five-minute rest breaks (Tr. 882-84).  The vocational expert testified that the plaintiff would not be able to perform his past work, but could perform the sedentary jobs of machine tender, order clerk, and surveillance monitor (Tr. 883-84).  An individual that needed one additional five-minute break would still be able to perform those jobs.  The more breaks an individual takes, the less likely they were going to be able to maintain employment.  Two additional breaks of five minutes would not necessarily preclude employment, but it could reduce the number of jobs available.  Four additional breaks of five to ten minutes would preclude work (Tr. 883-85).

The attorney asked the vocational expert about the limitations assigned by Dr. Ekunsanmi.  The vocational expert stated that an individual with those limitations would not be able to sustain employment.   The attorney asked the vocational expert about the sit/stand option and whether or not the vocational expert felt there was a frequency in the sit/stand option that would preclude work.  The vocational expert felt there was a frequency that would preclude work, and that it was unrealistic to expect an individual to remain on task while changing positions more frequently than every 30 minutes.  The attorney noted

20

that the plaintiff's restrictions were right on the cusp of that limit because the ALJ's limitations included changing positions twice an hour.  The addition of the need for an assistive device or a cane while standing, in addition to the walking, would be a substantial vocational impediment.  Sedentary work required good bilateral use of the upper extremities.  If one arm was taken away, there was a substantial impact on the sedentary level.  The vocational expert testified that there would be no work for an individual that needed to lie down during the workday (Tr. 885-87).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1)  failing to properly consider the medical expert's opinion; (2)  failing to properly assess medical opinion evidence; and (3) failing to provide a meaningful assessment of his subjective complaints.  The relevant period at issue is from September 13, 2005 (alleged onset date of disability), through December 2, 2008 (the day before the date the plaintiff was found to be disabled in a prior decision).

### Dr. Levine

The plaintiff argues that the ALJ erred in her evaluation of the medical expert's opinion in determining the onset date of disability (pl. brief at 24-28).  The ALJ called on Dr. Levine, an orthopedic surgeon, as a medical expert to assist in the determination of the plaintiff's onset date of disability (Tr. 872), as the Appeals Council had instructed the ALJ to do (Tr. 894).  The plaintiff first contends that the ALJ failed to adopt Dr. Levine's testimony that the plaintiff was "found . . . to be disabled"[2] from September 2005 to September 2006 (pl. brief at 24-25).  However, the undersigned agrees with the Commissioner that this was not Dr. Levine's testimony.  At the administrative hearing, Dr. Levine testified:

---

[2]The plaintiff further states that Dr. Levine "deemed [him] to be disabled" from September 2005 to September 2006 (pl. brief at 26).

> [I]n my opinion a . . . spinal fusion takes approximately 12 months to become radiographically, clinically, and functionally healed or totally solvent.  And it's my opinion that during that period, an individual really is not capable of even sedentary work on a sustained basis, six out of eight hours a day, five days a week.  So that in my opinion, I feel he would be less than sedentary capable form 9/13/05 until 9/13/06. . . .

(Tr. 876).  Following this testimony, Dr. Levine discussed Dr. Ekunsanmi's opinion that the plaintiff was disabled since 2005.  Dr. Levine stated that it appeared that Dr. Ekunsanmi was basing his opinion primarily on the plaintiff's subjective complaints as "the objective findings did not correlate with a total disability" (Tr. 876 (citing Tr. 651)).  Dr. Levine also discussed Dr. Brigham's treatment note stating that there was "'no objective reason to even restrict heavy lifting' and that was on 3/8/06," just six months following the plaintiff's spinal fusion (Tr. 876-77 (citing Tr. 416)).

As argued by the Commissioner, Dr. Levine did not opine that the plaintiff's restrictions while recovering from surgery would last for at least one full year. Social Security Ruling ("SSR") 83-20 provides that "[t]he onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or substantial gainful activity) for a continuous period of at least 12 months or result in death."  1983 WL 31249, at *3.  A close reading of Dr. Levine's testimony reveals that he opined that the plaintiff would be capable of less than sedentary work on a sustained basis for one day less than one year (Tr. 876).  Then, "allowing for some back pain of the postoperative fusion, failed back syndrome, and even adjusting for some epidural fibrosis, . . .  from September 13, 2006, through December 2008," the plaintiff was capable of performing a range of light work, including lifting 20 pounds occasionally and ten pounds frequently; sitting six of eight hours; standing for three of eight hours, but no longer than 30 minutes at one time without sitting for one to two minutes; walking for two of eight hours, but no longer than 20 minutes

at one time; avoiding uneven surfaces; occasionally navigating ramps and stairs with a railing; occasionally kneeling; occasionally crouching, stooping or bending, but not repetitively; should avoid ladders, scaffolds, crawling, heavy vibrating machinery, unprotected heights, and extreme cold exposure; and should avoid repetitive twisting of the lumbar spine or trunk; and only the use of the upper extremities for fine and gross manipulation (Tr. 877-78).

        The plaintiff further argues that the ALJ's discussion of Dr. Levine's testimony is "misleading" (pl. brief at 26-27). The ALJ discussed Dr. Levine's testimony, addressing the entire period at issue from September 13, 2005, to December 2, 2008 (Tr. 736, 738). Although she afforded Dr. Levine's opinion "significant" weight, the ALJ did not include and was not required to include in the residual functional capacity ("RFC") assessment Dr. Levine's statement that the plaintiff was limited to less than sedentary work during his recovery, a less than one-year period beginning on September 13, 2005. *Cook v. Colvin*, No. 2:13-cv-30155, 2015 WL 430880, at *12 (S.D.W.Va. Sept. 23, 2013) ("[T]he ALJ may give great weight to expert's opinion without including every finding, limitation, and assessment contained in the expert's record.").

        When the plaintiff raised this issue to the Appeals Council, the Appeals Council stated:

> We agree that the decision would benefit from a clearer explanation regarding the opinion of Dr. Levine that the claimant was not capable of even sedentary work during the period September 2005 to September 2006. However, we believe it is reasonably clear from other discussion in the decision that the [ALJ] did not agree with that part of Dr. Levine's opinion. Specifically, the [ALJ] gave great weight to opinions from Dr. Brigham and Dr. [Fleischer] suggesting that the claimant was capable of at least sedentary work during that period. . . .

(Tr. 715-16). The undersigned agrees with the Appeals Council that, while the ALJ's assessment of this portion of Dr. Levine's opinion could be clearer, the decision provides

sufficient explanation for the RFC finding. The ALJ noted that Dr. Levine believed the plaintiff would be restricted to a less than sedentary position during his recovery from back surgery. However, the ALJ also noted that Dr. Levine testified that Dr. Ekunsanmi's opinion that the plaintiff was disabled starting in January 2005 did not correlate with the objective findings (Tr. 738; *see* Tr. 876). The ALJ also reviewed other medical opinions from that same time frame and afforded them "significant" weight (Tr. 739). Specifically, the ALJ assigned "significant" weight to the March 8, 2006, opinion of treating surgeon Dr. Brigham, who opined that the plaintiff could do whatever he was comfortable doing, even heavy lifting (Tr. 739; *see* Tr. 416) and that he could return to regular duties at that time (Tr. 450). The ALJ further referenced Dr. Brigham's January 9, 2006, statement that the plaintiff would be released from his care without any permanent restrictions and that he would not be considered permanently and totally disabled (Tr. 739; *see* Tr. 417). The ALJ likewise gave "significant" weight to the opinion of Dr. Fleischer, who noted in May 2006 that the plaintiff was young and should be able to return to work (Tr. 739; *see* Tr. 459). Dr. Fleischer further noted that, despite using a cane, the plaintiff had a normal gait without it and had a whole person impairment of only 10% or 17% in the lumbar spine only (Tr. 739, 459).

Additionally, the ALJ reviewed the medical evidence, spanning from 2004 to 2008, in determining the plaintiff's RFC (Tr. 736-39). This evidence included: the treatment notes of Dr. Brigham, who noted that the plaintiff's fusion had progressed, that there was no shift of hardware, and that he had a fusion mass (Tr. 737); the examination of Dr. Fleischer, who recommended that the plaintiff return to the workforce (Tr. 737-38); and the treatment notes of Dr. Okonneh, who provided injections and medication and noted that, despite bilateral sacroiliac joint tenderness and a positive straight leg test, the plaintiff had full 5/5 strength in all extremities (Tr. 738). The plaintiff argues that the ALJ erred because she "only . . . cited" one treatment note after September 2006 in her review of the evidence (pl. brief at 26-27). While the ALJ did not specifically discuss each individual treatment note

24

in that time frame, the ALJ did summarize Dr. Okonneh's treatment of the plaintiff from 2006 to 2008, noting that treatment notes in that time period showed intermittent injections and oral and topical narcotic pain medications (Tr. 738 (citing Tr. 621-29)).  As argued by the Commissioner, the plaintiff fails to indicate what further discussion the ALJ should have conducted in summarizing and reviewing these notes.

Where, as here, the ALJ reviewed the relevant opinion and medical evidence and granted significant weight to the treating and examining orthopedic surgeons, who opined that the plaintiff could return to as much as heavy work months before September 2006, the ALJ appropriately found that the plaintiff could perform a limited range of light work during the time period between September 13, 2005, and December 2, 2008 (Tr. 735-39).  Consequently, it is clear that she did not accept Dr. Levine's limitations to a period of less than sedentary work from September 13, 2005, until, but not including, September 13, 2006 (Tr. 735-39).  Any further articulation by the ALJ regarding Dr. Levine's testimony would not change the outcome of the case due to her reliance on the other opinions and medical evidence discussed above.  Therefore, even assuming that the ALJ should have further articulated her finding that the plaintiff could perform a limited range of light work from September 2005 to September 2006, any such error is, at most, harmless. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir.1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

Based upon the foregoing, substantial evidence supports the ALJ's evaluation of Dr. Levine's testimony and the determination that the plaintiff's onset of disability did not occur prior to December 3, 2008.

25

### Dr. Ekunsanmi

The plaintiff next argues that the ALJ failed to properly assess the opinions of his primary care physician, Dr. Ekunsanmi (pl. brief at 28-34). The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

26

On October 31, 2007, Dr. Ekunsanmi wrote a letter stating that complications of the plaintiff's spinal injury include paraparesis of lower extremities, urinary incontinence, and erectile dysfunction and that "[t]hese disabilities are permanent" (Tr. 591).   On December 3, 2008, Dr. Ekunsanmi completed a physical capacities evaluation, opining that the plaintiff could sit less than one hour, stand/walk less than one hour, and that he would need to alternate sitting and standing at will throughout the day.   He could not use his hands for repetitive motion tasks.   He should never lift more than eleven pounds, climb, balance, stoop, knee, crouch, crawl, or reach above shoulder level.   Dr. Ekunsamni opined that there was a medical basis for the plaintiff's pain and that the pain would be disabling to the extent that it would prevent him form working full time at even a sedentary position (Tr. 606-609).   On December 14, 2011, Dr. Ekunsanmi provided a letter stating that the plaintiff has impaired mobility, paresthesias, and back pain with radiculopathy and that he "is disabled" (Tr. 644).   Dr. Ekunsanmi submitted an additional letter on August 6, 2012, noting that the plaintiff was treated by him since January 1, 2005, and that the plaintiff had been "declared disable[d]" since that time (Tr. 651).

The ALJ considered the opinions and gave them "little weight," finding that the opinions were not consistent with the other objective evidence, as discussed by medical expert Dr. Levine, and that as a primary care physician he was not a specialist, and therefore his opinion was entitled to less weight (Tr. 738).   The plaintiff first contends that it was error for the ALJ to assign little weight to Dr. Ekunsanmi's December 2008 opinion because the ALJ found this opinion to be "controlling" in the previous December 14, 2012, decision (pl. brief at  32).   The plaintiff's argument fails.   In the December 2012 decision, the ALJ decision found Dr. Ekunsanmi's December 2008 opinion "to be persuasive for the period beginning on December 3, 2008" (Tr. 14).   Thus, the ALJ never assigned that opinion controlling weight and only assigned it "persuasive" weight to the extent it dealt with the plaintiff's abilities as of December 3, 2008 – a period not at issue in this appeal.

27

Moreover, in the order remanding the case to the ALJ, the Appeals Council stated that the previous decision by the ALJ was vacated for the time period prior to December 3, 2008 (Tr. 892). Pursuant to the Social Security Administrations's Hearings, Appeals, and Litigation Law Manual ("HALLEX") I-2-8-18, 1993 WL 643058, when the Appeals Council remands a case to the hearing level after a court remand, the ALJ "must consider all pertinent issues *de novo*." *Id*. Because the ALJ was to consider all issues *de novo*, including the weight of the medical opinion evidence, she was not required to assign Dr. Ekunsanmi's opinions the same level of weight in the decision at issue here as in the prior decision. See *Hancock v. Barnhart*, 206 F. Supp.2d 757, 763–64 n.3 (W.D. Va. 2002) (on remand, the ALJ's prior decision has no preclusive effect as it is vacated and the new hearing is conducted *de novo*).

The plaintiff further argues that the ALJ erred in discounting Dr. Ekunsanmi's opinions on the basis that he was not a specialist (pl. brief at 32). This argument also fails. Pursuant to the regulations, the ALJ is permitted to "give more weight to the opinion of a specialist about medical issues related to his area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). As discussed at the November 20, 2014, administrative hearing, the record showed that Dr. Ekunsanmi was a family practitioner, working in primary care (Tr. 867). Where, as here, the ALJ also reviewed the opinions of several orthopedic surgeons, including Dr. Levine, the medical expert; Dr. Brigham, the treating orthopedic surgeon; Dr. Fleischer, an examining orthopedic surgeon; and Dr. Scott, a consulting orthopedic surgeon (Tr. 738-39), the ALJ was permitted to assess more weight to those practitioners who specialized in orthopedics, where they opined on the plaintiff's orthopedic-related limitations.

The ALJ also properly discounted Dr. Ekunsanmi's opinions on the basis that they were not consistent with the "other objective evidence, as Dr. Levine, the impartial expert, testified to at the hearing" (Tr. 738). Medical opinion evidence is properly

28

discounted by the ALJ when it is internally inconsistent or inconsistent with the other evidence. 20 C.F.R. § 404.1527(c)(2), (4); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.").   Here, Dr. Levine reviewed a number of the record's objective findings on examination (Tr. 875-76).  For example, Dr. Levine noted that on September 30, 2005, Dr. Brigham found no true abnormality or reflex abnormality (Tr. 875; *see* Tr. 420).  On July 23, 2006, although the plaintiff had some decreased reflexes, they were symmetrical (Tr. 875; *see* Tr. 477).  The plaintiff had normal strength and was not using an assistive device, although he walked with a limp (Tr. 875; *see* Tr. 477).  On October 23, 2007, the plaintiff had good strength, normal reflexes, negative straight leg raising, no lumbosacral spasm, and was able to get up and down from the exam table independently (Tr. 875; *see* Tr. 589). While the plaintiff walked with a cane, he was able to ambulate without it (Tr. 875; *see* Tr. 589).  Dr. Levine further noted that while there were exhibits referencing use of a cane, there were also many which indicated a normal gait (Tr. 876; *see* Tr. 417 (January 9, 2006 – "still is using a cane"), 601-02 (August 2007 – mild difficulty ambulating and walked with a cane), 624, 626, 628 (May and August 2008 – mild difficulty ambulating and walked with a cane), *but see* Tr. 459 (May 15, 2006 – had a cane but could walk with a normal gait), 477 (July 23, 2007 – mild limp, but did not walk with a cane), 588 (October 23, 2007 – walked with a cane, but ambulated well without it)).

Moreover, Dr. Levine noted that Dr. Ekunsanmi appeared to base his opinion primarily on subjective complaints of pain and that the objective findings (discussed above) did not correlate with total disability (Tr. 876).  Dr. Levine also noted that he was unsure "how valid" Dr. Ekunsanmi's August 2012 opinion was because, in that opinion, Dr. Ekunsami stated that the plaintiff had been disabled since January 2005, despite the fact that the plaintiff was working 12-hour shifts at that time (Tr. 876-77; *see* Tr. 422 (8/5/05

treatment note by Dr. Ekunsami stating that the plaintiff was working 12-hour shifts and would be limited to six-hour days thereafter), 651 (8/6/12 opinion)).  While the plaintiff asserts that Dr. Ekunsanmi's statement that the plaintiff was disabled since January 2005 was a "clerical error" because he did not begin treatment with Dr. Ekunsanmi until 2006 (pl. brief at 33), this statement is unsupported.  Although it appears that the plaintiff began treatment with Dr. Ekunsanmi in May 2006 (Tr. 467), his work accident occurred in July 2004, and thus there is no evidence that Dr. Ekunsanmi's opined date is in error (Tr. 511).  While the plaintiff also complains that Dr. Levine did not discuss "all" of Dr. Ekunsanmi's opinions (pl. brief at 33), it is the ALJ and not the medical expert who is the fact-finder in determining the RFC.  The October 2007 opinion of Dr. Ekunsanmi stated only that the plaintiff suffered from complications of spinal injury including paraparesis of lower extremities, urinary incontinence, and erectile dysfunction and that "[t]hese disabilities are permanent" (Tr. 591).  The opinion included no functional limitations for the ALJ to consider.  Further, Dr. Ekunsanmi's December 3, 2008, physical capacities evaluation addressed the plaintiff's limitations as of that date – a period not at issue here (Tr. 606-09).

The plaintiff argues that there were no other opinions from treating physicians during the relevant period other than Dr. Ekunsanmi's (pl. brief at 33-34).  This is incorrect, as Dr. Brigham opined on March 8, 2006, that the plaintiff was capable of doing even heavy work (Tr. 416) and completed a work status report opining that the plaintiff could return to regular duties (Tr. 450).  Also, consulting orthopedic surgeon Dr. Scott examined the plaintiff during the relevant time period, and the ALJ gave significant weight to his findings (Tr. 739).  The plaintiff contends that the ALJ failed to explain why Dr. Scott's opinion was accorded more weight than Dr. Ekunsanmi's opinion (pl. brief at 33-34).  As the ALJ discussed, Dr. Scott noted that work restrictions could likely be best assessed through a functional capacity evaluation (Tr. 590), but Dr. Scott was able to examine the plaintiff and note that he was well-developed and, despite using a cane, the plaintiff ambulated well

without it (Tr. 739; *see* Tr. 588). Dr. Scott noted that the plaintiff could touch his left foot without difficulty; rose from the chair and moved on and off the examining table independently; demonstrated good mobility in the cervical and thoracic spines; had negative straight leg tests; could maintain toe and heel standing; and had good strength both on plantar flexion and dorsiflexion; though the plaintiff endorsed numbness in his great toe and instep, and the lateral margins of both feet (Tr. 589). While Dr. Scott did not complete an RFC assessment, the ALJ properly considered Dr. Scott's medical findings on examination and afforded them significant weight along with the other medical evidence and opinions discussed above (Tr. 739).

As the finder of fact, the ALJ had the task of evaluating the conflicting medical reports in this case. Where, as here, medical sources are in disagreement, it is the finder of fact who must ultimately determine the relative weight to accord the various medical source opinions. The undersigned finds that the ALJ provided a rationale supported by substantial evidence for the weight she assigned to Dr. Ekunsanmi's opinion.

### Subjective Complaints

Lastly, the plaintiff argues that the ALJ provided no meaningful assessment of his credibility (pl. brief at 34-37). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996) (citations and internal quotation marks omitted) (emphasis in original).  In *Hines v. Barnhart*, a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d 559, 565 (4th Cir. 2006).  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id*. at 564 (quoting SSR 90-1p, 1990 WL 300812).  The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not

substantiate your statements."); SSR 16-3p[3], 2016 WL 1119029, at *5  ("[W]e will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual. A report of minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on" in evaluating the claimant's subjective symptoms. *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 16-3p states that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms. " 2016 WL 1119029, at *9.  The factors to be considered by an ALJ in evaluating the intensity, persistence, and limiting effects of an individual's symptoms include the following:

(1) the individual's daily activities;

(2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;

---

[3]SSR 16-3p supersedes SSR 96-7p.  The ruling eliminates the use of the term "credibility" and clarifies that subjective symptom evaluation is not an examination of an individual's character.  2016 WL 1119029, at *1.  The effective date of SSR 16-3p is March 28, 2016. 2016 WL 1237954, at *1.  While the ALJ issued his decision prior to the effective date of SSR 16-3p, the two-step process and factors for evaluating a claimant's subjective symptoms remains substantially the same as that for assessing the credibility of a claimant's statements under SSR 96-7p.

(3) factors that precipitate and aggravate the symptoms;

(4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id*. at *7.  *See* 20 C.F.R. § 404.1529(c).

The ALJ found that while the plaintiff's impairments were "at least theoretically capable of producing at least some of the general subjective symptoms alleged" by the plaintiff, his testimony as to the intensity, persistence, and limiting effects of those symptoms was "not persuasive in view of his daily activities and the inconsistencies in the record" (Tr. 736-37).  The ALJ considered the following factors in assessing the plaintiff's subjective complaints:  daily activities (Tr. 736 (noting that the plaintiff reported living at home; drove; did not cook because he did not know how; and did no cleaning, though he helped to wash dishes); the location, duration, and frequency of the pain, precipitating factors, and measures used to relieve pain (Tr. 736 (reviewing the plaintiff's testimony regarding his alleged back pain and that the plaintiff asserted that he was unable to stand longer than 30 minutes to one hour, and that he could not sit for longer than two hours because his legs go numb); medication and side effects (Tr. 736-38 (noting that the plaintiff's medication at various times included Valium, Lyrica, Lortab, and Duragesic, and that the plaintiff testified that his medication made him drowsy); and treatment beyond medication (Tr. 737-38 (noting that following his September 2005 L5-S1 fusion, the plaintiff

34

was prescribed physical therapy and a TENS unit, and later underwent lumbar injections on an intermittent basis).

The ALJ properly considered the inconsistencies in the medical record in assessing the plaintiff's subjective complaints. *See* 20 C.F.R. §§ 404.1529(c)(2), (4).  The ALJ reviewed the medical evidence and noted the following:

> • The plaintiff's September 13, 2005, surgery was a "minimally invasive" L5-S1 fusion, and post-operative x-rays showed adequate position of the hardware and interbody graft (Tr. 737; *see* Tr. 453, 455);

> • A January 2006 CT scan of the lumbar spine showed good position of hardware and subsidence of his graft, although there appeared to be some early obliteration of interface lines at L5 continuing to S1 (Tr. 737 *see* Tr. 417, 542-43);

> • March 2006 lumbar x-rays showed that the plaintiff's fusion had progressed, there was no shift in hardware, and that there was a fusion mass (Tr. 737; *see* Tr. 416);

> • In March 2006, Dr. Brigham opined that the plaintiff would ultimately be released without permanent restrictions and would not be considered permanently and totally disabled (Tr. 737; *see* Tr. 417);

> • In May 2006, Dr. Fleischer opined that the plaintiff's whole person impairment was 10% to 17% to his lumbar spine only and recommended that the plaintiff could go back to the work force (Tr. 737-38; *see* Tr. 459);

> • In June 2006, an MRI of the lumbar spine showed post-surgical changes at L5-S1 with an enhancing scar around portions of the left S1 nerve root, but no evidence of recurrent disc herniation (Tr. 738; *see* Tr. 460);

> • Examination with Dr. Okonneh revealed bilateral sacroiliac joint tenderness and a positive straight leg test, but a negative axial loading test and 5/5 (full) strength in all extremities (Tr. 738; *see* Tr. 628);

> • Dr. Scott noted that while the plaintiff used a cane, he was able to walk well without it and was muscular and well-developed (Tr. 738; *see* Tr. 588);

35

• At the hearing, Dr. Levine reviewed the objective evidence and noted that records showed that the plaintiff did not have any true motor abnormality; his reflexes were normal; he had normal strength; and could ambulate without a cane (Tr. 736; *see* Tr. 875-76).

Based upon the foregoing, the undersigned finds that the ALJ adequately explained her evaluation of the intensity, persistence, and limiting effects of the plaintiff's symptoms, and that evaluation is based upon substantial evidence.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 6, 2017
Greenville, South Carolina

36